Douglas Stewart CARTER,
Petitioner–Appellant,

v.

Alfred C. BIGELOW, Warden, Utah
State Prison, Respondent–
Appellee.

No. 12–4203.

United States Court of Appeals,
Tenth Circuit.

June 2, 2015.

Paula Harms, Assistant Federal Public Defender (and Jon M. Sands, Federal Public Defender; David A. Christensen, Assistant Federal Public Defender, Salt Lake City, UT, on the briefs), Phoenix, AR, for Petitioner–Appellant.

Thomas Brunker, Assistant Attorney General, (and Erin Riley, Assistant Attorney General, Salt Lake City, UT; Sean D. Reyes, Utah Attorney General, on the brief), Salt Lake City, UT, for Respondent–Appellee.

Russell P. Butler (and Victor Stone with him on the brief) of Maryland Crime Victims' Resource Center, Inc., Upper Marlboro, MD, for Victim Gary Olesen.

Before KELLY, LUCERO, and MORITZ, Circuit Judges.

KELLY, Circuit Judge.

In this capital case, Petitioner–Appellant Douglas Stewart Carter, a Utah inmate, appeals from the district court's denial of his petition for writ of habeas corpus challenging his conviction and death sentence. *Carter v. Bigelow,* No. 2:02–CV–326, 2012 WL 3964819 (D.Utah Sept. 11, 2012). Mr. Carter was convicted of the murder of Eva Olesen in Provo, Utah in 1985 and subsequently sentenced to death. Mr. Carter appeals the district court's denial of habeas relief on seven of his claims: (1) ineffective assistance of guilt-phase counsel; (2) ineffective assistance of appellate counsel; (3) ineffective assistance of sentencing counsel at his 1992 resentencing; (4) denial of due process and right to remain silent based on two of the prosecutor's comments at closing argument; (5) denial of Confrontation Clause rights at resentencing; (6) denial of Fifth Amendment rights based on the admission of an involuntary confession; and (7) cumulative error.

In addition, Mr. Carter appeals from the district court's earlier denial of his motion to amend or supplement his habeas petition with claims based on newly discovered evidence of prosecutorial misconduct. *Carter v. Bigelow,* 869 F.Supp.2d 1322 (D.Utah 2011). In 2011, two key witnesses that corroborated Mr. Carter's confession at trial, Epifanio and Lucia Tovar, executed declarations stating that the Provo Police Department provided them with rent money, groceries, and other favorable treatment in advance of their testimony. These declarations are in part corroborated by declarations from members of the Provo Police Department. Mr. Carter contends that the district court should have allowed him to amend or supplement his habeas petition to include claims of prosecutorial misconduct and suppression of evidence based on this evidence. He further argues the district court should

have granted him a stay pursuant to *Rhines v. Weber,* 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005), to exhaust these claims in Utah state court.

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a). We conclude that the district court abused its discretion in refusing to allow Mr. Carter to supplement his habeas petition with claims based on newly discovered evidence of prosecutorial misconduct and suppression of evidence. Because the district court did not address whether a stay of these claims to permit exhaustion was appropriate, we remand to allow this determination in the first instance.

As to Mr. Carter's remaining claims, with the exception of his claim of cumulative error, we affirm the district court's denial of habeas relief. We conclude that these claims can be resolved even given the possibility of future evidentiary development of his prosecutorial-misconduct and suppression-of-evidence claims. Further delay and subsequent re-briefing of the other claims is not justified given the protracted time period—now over thirteen years—Mr. Carter's federal habeas petition has been pending. As to Mr. Carter's claim of cumulative error, we vacate the denial of relief and remand to the district court based on the possibility that Mr. Carter's supplemental claims could alter the cumulative error analysis.

### Background

Specific facts regarding Mr. Carter's claims are discussed alongside each claim. The general facts surrounding Mr. Carter's conviction and sentence are as follows:

On the evening of February 27, 1985, Eva Olesen was found dead at her home in Provo, Utah. Her hands were tied behind her back with a telephone cord, and she was nude from the waist down. A kitchen

knife was found on the floor next to her body. She had been stabbed eight times in the back, once in the abdomen, and once in the neck, and she had suffered a fatal gunshot wound to the back of the head. The markings on the slug removed from her body were consistent with those produced by a .38 caliber handgun.

Mr. Carter became the primary suspect in Mrs. Olesen's murder in April 1985 when his wife, Anne Carter, provided the police with information about her husband's possible involvement. Mrs. Carter told the police that, on the night of the murder, Mr. Carter went to visit his friend Epifanio Tovar and met two of Mr. Tovar's friends. One of these friends held a grudge against Provo Police Chief Swen Nielsen, a relative of Mrs. Olesen. The three men decided to go to Mrs. Olesen's residence to steal her gold necklace. According to Mrs. Carter, Mr. Carter waited in the car while the other men knocked and entered the home, and Mr. Carter did not know that Mrs. Olesen was dead until the men returned to the car and told him. Mrs. Carter agreed to a search of her home, and the police recovered .38 caliber ammunition. Although Mrs. Carter suspected that her missing .38 caliber handgun was the murder weapon, no weapon was recovered.

Based on the information provided by Mrs. Carter, the police turned their attention to Epifanio Tovar. Mr. Tovar told the police that Mr. Carter had left Mr. Tovar's home on the night of the murder with the intention of stealing money and returned two hours later very nervous and wearing different clothes. Mr. Carter told him he had knocked on the Olesens' door, entered the home, stabbed Mrs. Olesen roughly ten times, and, because she did not die, shot her in the back of the head. Finally, Mr. Tovar told the police that Mr. Carter brought a .38 caliber firearm to Mr. To-var's house some time after the murder and that Mr. Tovar disposed of the gun at Mr. Carter's request.

On June 11, 1985, police arrested Mr. Carter in Nashville, Tennessee. At the time of his arrest, Mr. Carter was living with JoAnne Robins, who was also taken into custody. Mr. Carter was first interrogated by Sergeant Cunningham of the Nashville Police Department and, the next day, by Lieutenant George Pierpont of the Provo Police Department. After speaking with Lt. Pierpont for a short time, Mr. Carter confessed to entering Mrs. Olesen's home, stabbing her several times, and shooting her in the back of the head.

Mr. Carter was charged with first-degree murder under Utah Code Ann. § 76–5–202. No physical evidence or eyewitness testimony placed Mr. Carter at the scene of the murder of Mrs. Olesen. *See Carter*, 2012 WL 3964819, at \*2 n. 21. The only evidence corroborating Mr. Carter's confession was the testimony of Epifanio and Lucia Tovar (Epifanio's wife), whom the Utah Supreme Court described as the "key witnesses." *State v. Carter*, 888 P.2d 629, 645 (Utah 1995) (*Carter II*). Mr. Tovar described to the jury his conversation with Mr. Carter in which Mr. Carter described how he killed Mrs. Olesen. Mrs. Tovar testified that she overheard the conversation, though they were speaking in English and Mrs. Tovar only spoke Spanish. She testified that Mr. Carter demonstrated how he bound and stabbed Mrs. Olesen and was laughing. Notably, the Tovars testified they took the stand free of inducement, with the exception of court-ordered witness fees of $14 each.

On December 18, 1985, the jury found Mr. Carter guilty of first-degree murder and, the following day, sentenced him to death. The Utah Supreme Court affirmed Mr. Carter's conviction, but reversed his death sentence. *State v. Carter*, 776 P.2d 886 (Utah 1989) (*Carter I*). In 1992, Mr.

Carter was resentenced to death, and the Utah Supreme Court affirmed. *Carter II*, 888 P.2d 629.

Mr. Carter filed his first petition for state post-conviction relief in October 1995. The state trial court dismissed all of his claims, and the Utah Supreme Court affirmed. *Carter v. Galetka*, 44 P.3d 626 (Utah 2001) (*Carter III* ).

Mr. Carter's federal habeas proceedings began in April 2002.[1] On March 25, 2004, Mr. Carter filed his initial petition for habeas relief in the district court, raising nearly fifty claims and various sub-claims. Mr. Carter subsequently withdrew several of his claims and filed a Second Amended Petition on March 1, 2006. The district court granted Mr. Carter's request for a stay pursuant to *Rhines v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005), which authorizes a "stay and abeyance" procedure where a petitioner presents a "mixed petition"—one including both exhausted and unexhausted claims— and other requirements are satisfied.

On April 28, 2008, the district court granted Utah's motion to vacate the stay and re-open the case. On July 20, 2010, the court issued an order granting in part Utah's motion to dismiss, finding that a number of Mr. Carter's claims, including his claims that the prosecution improperly suppressed evidence, were procedurally barred.[2]

On August 18, 2011, Mr. Carter filed a new motion for a stay to exhaust claims of prosecutorial misconduct under *Brady v.* *Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), based on newly discovered evidence that Epifanio and Lucia Tovar received cash payments and other favorable treatment from the Provo Police Department in advance of testifying. The district court denied Mr. Carter's motion on the grounds that no *Brady* or *Napue* claims remained in his petition and suggested that he could move to amend or supplement his petition with such claims. *Carter v. Bigelow*, No. 2:02–CV–326 TS, 2011 WL 5041202 (D.Utah Oct. 24, 2011). Mr. Carter then moved to amend or supplement his petition, but the district court denied his motion, relying chiefly on an intervening footnote from this court directing Mr. Carter to bring "any new claims" pursuant to the procedures for a second or successive habeas petition. *Carter v. Bigelow*, 869 F.Supp.2d 1322, 1326 (D.Utah 2011) (relying on *In re Olesen*, 447 Fed.Appx. 868, 871 n. 4 (10th Cir.2011)).

On September 11, 2012, the district court denied Mr. Carter's petition for a writ of habeas corpus. *Carter*, 2012 WL 3964819. The district court granted a certificate of appealability on all claims, and Mr. Carter filed a timely appeal.

### Discussion

#### I. Mr. Carter's Brady/Napue Claims

##### A. Additional Facts

At trial, Epifanio and Lucia Tovar were key witnesses against Mr. Carter, placing

---

1. The parties initially disagreed whether Utah satisfied the opt-in provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and the district court tolled the limitation period while it made this determination. This court rejected Utah's request for permission to appeal and a writ of mandamus challenging the district court's determination that the limitation period of 28 U.S.C. § 2244(d)(1) was tolled during this time.

*Friel v. Carter*, No. 04–600 (10th Cir. Mar. 31, 2004).

2. The court subsequently requested briefing on any further factual development Mr. Carter sought. However, in 2011, after the Supreme Court's decision in *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), the district court held that further factual development would be unavailable.

him at the scene of the crime on the night of Mrs. Olesen's murder and corroborating his confession. Epifanio testified that he and his wife received nothing more than witness fees of $14 each in exchange for their testimony. In Utah court, the state maintained that "all evidence in any way relevant to the case and known to the State" had been provided to Mr. Carter "long ago." *Carter II*, 888 P.2d at 636–37.

Some time before Mr. Carter's resentencing, Epifanio and Lucia Tovar disappeared. Utah maintained at resentencing, and still maintains, that the Tovars were unavailable to testify at resentencing because they had fled the country. *Id.* at 646; Aplee. Br. 162–67.

In mid-March 2011, Mr. Carter's counsel was able to locate the Tovars through what the district court described as "coincidence." *Carter*, 2012 WL 3964819, at *2 n. 34. The Tovars' son was arrested in Arizona, agreed to speak with Mr. Carter's investigator, and eventually led the investigator to his parents. Prior to that time, Mr. Carter asserts that his counsel had been searching for the Tovars but had found no concrete leads—just information that they may have been in the large city of Culiacán, Mexico.

Epifanio and Lucia Tovar executed declarations describing the favorable treatment provided to them by the Provo Police Department in advance of Mr. Carter's trial. Epifanio, in declarations in April and August of 2011, stated that the Provo police twice moved him and his wife to a new apartment, paid their rent (roughly $400 a month), paid their utilities and phone bills, and brought them groceries. 13 R. 466–67, 469–70. He further explained that the police coached his statements during interrogation and specifically told him "not to say anything about [the police] paying for our apartment and other living expenses" at Mr. Carter's trial. *Id.*

at 469. Lucia Tovar, also in April and August of 2011, executed declarations that the Provo police sent them "gifts," including food baskets, one hundred dollars in an envelope, toys for their son, and a Christmas tree. *Id.* at 473. She confirmed that the police relocated the Tovars twice and paid for rent, utilities, and sometimes groceries. *Id.* at 477. Further, she explained that her testimony at Mr. Carter's trial was based not on what she heard Mr. Carter saying, but on what her husband told her Mr. Carter said. *Id.* at 473.

The Tovars' declarations were corroborated, at least in part, by declarations from officers of the Provo police. Officer Richard Mack explained that it was his "responsibility to make certain the Tovars were happy," and he admitted to giving them gifts, toys, a Christmas tree, and groceries. *Id.* at 479. As to rent, he explained, "I do not recall giving them money for their rent. I'm not saying I did not give them rent money but I do not recall giving them rent money." *Id.* Officer Stan Eggen confirmed that the Provo police "helped the Tovars out." *Id.* at 483. Several of Mr. Carter's former attorneys attested that the prosecution never provided them with this information.

Shortly after the latter of the Tovar declarations was executed, Mr. Carter requested a stay to exhaust claims of prosecutorial misconduct under *Brady* and *Napue* in Utah state court. The district court denied the motion on the grounds that Mr. Carter's petition was not a "mixed" petition; all unexhausted claims had been removed and only exhausted claims remained. *Carter*, 2011 WL 5041202, at *2. Though Mr. Carter's initial and amended habeas petitions included claims that the prosecution suppressed evidence of favorable treatment given to the Tovars in exchange for their testimony against Mr.

Carter,[3] the district court had previously dismissed these claims as procedurally defaulted. However, the district court suggested Mr. Carter could seek to amend or supplement his petition to include such claims and renew his motion for a stay.

On the same day, the district court denied Utah's motion to dismiss Mr. Carter's petition for lack of prosecution. Before Mr. Carter sought to amend or supplement his petition, victim's representative Gary Olesen, Eva Olesen's son, petitioned this court for a writ of mandamus ordering the district court to reconsider its denial of the state's motion to dismiss Mr. Carter's petition in a manner that protects his rights to "proceedings free from unreasonable delay" and to "be treated with fairness" under the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771.[4]

This court denied Mr. Olesen's request for mandamus, explaining that "while the question is close, we cannot conclude at this juncture that the prejudice and delay [to Mr. Olesen] overcome Carter's due process right to have his habeas case decided." *In re Olesen*, 447 Fed.Appx. at 871. We expressed optimism that "under the present briefing schedule this habeas action will soon be concluded by a final ruling by the district court" and encouraged the district court to "hold firm" to its briefing schedule. *Id.* Then, in a closing footnote, we added: "To the extent Mr. Carter seeks to assert in the district court any new claims not already asserted in the habeas petition, he must follow the procedures set forth in 28 U.S.C. § 2244 for filing a second or successive § 2254 habeas petition." *Id.* at n. 4. Section 2244 requires, among other things, a showing that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(ii). Mr. Carter petitioned for panel rehearing to have the footnote removed, but his request was denied.

Mr. Carter subsequently sought to amend or supplement his habeas petition to add claims based on the newly discovered evidence. The district court denied the request, relying chiefly on the final footnote of *In re Olesen. Carter,* 869 F.Supp.2d at 1325–27. The court interpreted the *In re Olesen* footnote to be binding, explaining that it was "not at liberty to ignore the clear statement by the Tenth Circuit that, if Petitioner seeks to add new claims, he must follow the procedures set out in 28 U.S.C. § 2244." *Id.* at 1326.

Mr. Carter claims that the district court erred in refusing to allow him to amend or supplement his habeas petition with claims based on the newly discovered evidence. Likewise, he asserts the district court

---

**3.** Claim II of Mr. Carter's initial federal habeas petition alleged that "the suppression of exculpatory evidence by the prosecution in Mr. Carter's 1985 case violated Mr. Carter's constitutional rights." 3 R. 209. Specifically, it alleged that "Mr. Tovar was offered favorable treatment in the form of promises to dismiss cases, not file cases or other favors from law enforcement and/or the prosecution in exchange for his testimony against Mr. Carter." *Id.* at 217. Claim IX made analogous allegations as to Mr. Carter's resentenc-

ing, including that both Lucia and Epifanio Tovar were "offered a deal or favorable treatment in exchange for [their] testimony." *Id.* at 253. Though Mr. Carter subsequently withdrew several claims, his second amended petition retained these claims. 5 R. 338–39, 375.

**4.** Pursuant to 18 U.S.C. § 3771(d)(3), this court was given 72 hours to decide the matter.

should have granted him a stay to exhaust these claims in Utah state court.

### B. *Supplemental Claims*

■ We review the district court's denial of Mr. Carter's motion to supplement his habeas petition for an abuse of discretion.[5] *United States v. Espinoza–Saenz,* 235 F.3d 501, 503 (10th Cir.2000). "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable," *United States v. Castillo–Arellano,* 777 F.3d 1100, 1103 (10th Cir.2015), or where "the court 'exceeded the bounds of permissible choice,' given the facts and the applicable law in the case at hand." *United States v. Regan,* 627 F.3d 1348, 1352 (10th Cir.2010) (quoting *United States v. McComb,* 519 F.3d 1049, 1053 (10th Cir. 2007)). In addition, a district court abuses its discretion when it commits legal error. *Breaux v. Am. Family Mut. Ins. Co.,* 554 F.3d 854, 866 (10th Cir.2009) (quoting *Davis v. Mineta,* 302 F.3d 1104, 1111 (10th Cir.2002)).

■ In general, a one-year limitation period applies to a federal habeas application. 28 U.S.C. § 2244(d)(1). However, an application "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." *Id.*

§ 2242. The federal rules provide that "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R.Civ.P. 15(d). Supplemental pleadings are thus appropriate to "set forth new facts in order to update [an] earlier pleading." 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1504 (3d ed.2014). They are distinct from amendments to pleadings under Rule 15, which "relate to matters that occurred prior to the filing of the original pleading." *Id.* Here, Mr. Carter seeks to add claims based on prosecutorial suppression of evidence and knowing presentation of false evidence. Because the prosecution's duty to disclose such evidence "is ongoing and extends to all stages of the judicial process," *Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir.1997) (citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)), Mr. Carter's claims could properly constitute either amended or supplemental pleadings to his habeas petition.[6] *See Douglas v. Workman,* 560 F.3d 1156, 1187 (10th Cir.2009) (treating petitioner's suppression-of-evidence claims as supplemental to his habeas petition); *Wolfe v. Clarke,* 819 F.Supp.2d 538, 568–69 (E.D.Va.2011) (treating petitioner's claim

---

5. In reviewing this claim, we note that our analysis is limited to the question whether Mr. Carter should have been allowed to supplement his habeas petition with *Brady* and *Napue* claims; we do not address the merit of either claim. Specifically, nothing in this opinion is meant to pass on the materiality of the evidence of favorable treatment given to the Tovars, a prerequisite to the prosecution's duty to turn over evidence under *Brady*. 373 U.S. at 87, 83 S.Ct. 1194.

6. We ultimately analyze Mr. Carter's claims as supplemental pleadings given their close factual relation to our decision in *Douglas,* 560 F.3d 1156. In any event, as we have

observed, "the standard used by courts in deciding to grant or deny leave to supplement is the same standard used in deciding whether to grant or deny leave to amend." *Fowler v. Hodge,* 94 Fed.Appx. 710, 714 (10th Cir. 2004) (unpublished) (citation omitted); *see also Glatt v. Chi. Park Dist.,* 87 F.3d 190, 194 (7th Cir.1996) (same); Wright & Miller, *supra,* at § 1504 ("Inasmuch as the discretion exercised by the court in deciding whether to grant leave to amend is similar to that exercised on a motion for leave to file a supplemental pleading, the court's inattention to the formal distinction between amendment and supplementation is of no consequence.").

based on *Napue v. Illinois* as a supplemental pleading under Rule 15(d)).

■ Authorization to supplement pleadings "should be liberally granted unless good reason exists for denying leave, such as prejudice to the defendants." *Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1278 (10th Cir.2001). This court discussed supplemental pleadings to habeas petitions under similar circumstances in *Douglas*, 560 F.3d 1156. There, the petitioner, death-row inmate Yancy Douglas, uncovered evidence supporting a *Brady* claim after a federal district court had dismissed his habeas petition, but while his appeal was pending. *Id.* at 1160. After benefit of further evidentiary development, this court held that Mr. Douglas's claims were more appropriately characterized as supplemental to his initial petition, rather than as a "second or successive" petition under § 2244(b)(2), based on several "unusual circumstances": (1) Mr. Douglas's initial petition remained pending—albeit on appeal; (2) he had raised a claim of improper prosecutorial vouching in his initial habeas petition, to which his *Brady* claim was "closely correlated"; (3) the prosecutor's violation of *Brady* was "willful and intentional"; (4) relatedly, the prosecutor's misconduct was actively concealed; (5) Mr. Douglas had been sentenced to death, calling for "a heightened concern for fairness"; (6) the inequity that would result from granting Mr. Douglas's co-defendant relief on an identical *Brady* claim; and (7) relief was not inconsistent with AEDPA's purposes, given the duty incumbent upon the prosecutor to turn over such evidence. *Id.* at 1190–95. Notably, habeas petitioners need not establish all of these factors to be granted leave to supplement their petitions under such circumstances. *Id.* at 1190 n. 20.

■ Mr. Carter has an even stronger claim to supplement his petition. Unlike the petitioner in *Douglas*, Mr. Carter sought to supplement his petition *before* the district court ruled on it. As in *Douglas*, Mr. Carter's petition contained a claim of improper prosecutorial vouching for Mrs. Tovar. Even more, Mr. Carter's initial and amended habeas petition contained the precise claim that the prosecution suppressed evidence of favorable treatment given to Epifanio and Lucia Tovar in exchange for their testimony.[7] As to the willfulness and concealment of prosecutorial misconduct, it is difficult to judge these factors absent further evidentiary development. However, we note that Mr. Tovar's declaration that the police directed him "not to say anything about [the police] paying for our apartment and other living expenses," appears to suggest willful concealment. Moreover, when Mr. Carter sought discovery in state court, the state asserted that "all [exculpatory] evidence ... was included in police reports long ago made available to Carter." *Carter II*, 888 P.2d at 636–37.

As to the fifth factor, Mr. Carter, like the petitioner in *Douglas*, has been sentenced to death, where we observe a "heightened concern for fairness." 560 F.3d at 1194; *see also Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ("Th[e] qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."). Finally, allowing Mr. Carter to supplement his habeas petition does not detract from "principles of comity, finality, and federalism" underlying AEDPA. *Duncan v. Walker*,

---

7. These claims had previously been dismissed by the district court as procedurally barred. Nevertheless, as in *Douglas*, we do not find determinative the fact that the district court had already dismissed the petitioner's original, closely related claims.

533 U.S. 167, 178, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (quoting *Williams v. Taylor,* 529 U.S. 420, 436, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000)). Such purposes are not objects to be achieved at any cost, and allowing prosecutors to escape habeas review by concealing *Brady* evidence "cannot have been Congress's intent in enacting AEDPA." *Douglas,* 560 F.3d at 1195.

In rejecting Mr. Carter's motion to supplement or amend, the district court relied on our footnote in *In re Olesen* stating that Mr. Carter must bring "any *new* claims not already asserted in the habeas petition" pursuant to the procedures set forth for second or successive habeas petitions under 28 U.S.C. § 2244. 447 Fed.Appx. at 871 n. 4 (emphasis added).

We readily concede that this footnote did not provide the district court with pellucid guidance as to how to analyze additional claims. But the district court interpreted the footnote as a mandate to treat *any* claims—not merely any *new* claims— that Mr. Carter subsequently brought as second or successive. Such an interpretation runs headlong into this court's standards for supplementing habeas petitions. *See Douglas,* 560 F.3d at 1190–96. Likewise, it conflicts with Supreme Court authority setting forth the standards for allowing amendments to habeas petitions. *See* Fed.R.Civ.P. 15(a)(2) (courts should "freely give leave" to amend "when justice so requires"); *Mayle v. Felix,* 545 U.S. 644, 664 & n. 7, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005) (holding that amendments to habeas petitions relate back under Fed.R.Civ.P. 15(c)(2) where they are "tied to a common core of operative facts" and citing with approval *Mandacina v. United States,* 328 F.3d 995, 999–1000 (8th

Cir.2003) (amended petition alleging failure to disclose a particular report relates back to date of original petition generally alleging *Brady* violation)). We do not believe that this court in *In re Olesen,* without any briefing on whether Mr. Carter should be allowed to supplement or amend his petition, intended to entirely foreclose these avenues of relief.

The far more reasonable interpretation of the *In re Olesen* footnote is one that harmonizes with existing authority. The footnote prevented Mr. Carter only from adding "new claims"—i.e., claims that go beyond proper supplements or amendments to his habeas petition.[8] Under this reading, the footnote was not a directive to the district court, but simply a statement of existing law. Interpreting the footnote in a manner that conflicted with Tenth Circuit and Supreme Court standards for supplementing and amending habeas petitions amounted to legal error warranting reversal under our abuse of discretion standard. *See Breaux,* 554 F.3d at 866.

 Even if we were to agree with the district court's interpretation of the *In re Olesen* footnote, we would still find it erred in treating the footnote as binding. In *In re Olesen,* victim's representative Gary Olesen sought a writ of mandamus pursuant to the CVRA, 18 U.S.C. § 3771(d)(3), ordering the district court to: (1) reconsider, in light of Mr. Olesen's CVRA rights, its denial of the state's motion to dismiss Mr. Carter's habeas petition; (2) afford Mr. Olesen his CVRA rights in all future proceedings; and (3) "avoid all further unwarranted delay and to report to this court within two weeks with a scheduling order to resolve the remaining issues in the habeas case by the end of 2011, if reconsider-

---

8. This interpretation is further bolstered by the fact that, as discussed *infra,* this court, in denying Mr. Olesen's request for mandamus, would have had no authority under the CVRA to issue a directive to the district court to bar all subsequent motions to amend or supplement Mr. Carter's petition.

ation of the motion to dismiss does not result in dismissal." 447 Fed.Appx. at 868.

We denied Mr. Olesen's request. Had we granted Mr. Olesen's request for mandamus, perhaps we could have ordered the district court to deny any subsequent motions to amend or supplement by Mr. Carter. *See In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1186 (10th Cir.2009) (explaining that an appellate court may use a writ of mandamus "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so"). But, in denying his request, we denied the only remedy we are authorized to grant under the CVRA: a writ of mandamus. *See* 18 U.S.C. § 3771(d)(3). No CVRA provision provides this court with any authority beyond granting a request for mandamus, and we have elsewhere expressed a "reluctan[ce] to read additional remedies" into the CVRA. *United States v. Hunter*, 548 F.3d 1308, 1315 (10th Cir.2008) (holding that CVRA victims may not appeal the alleged denial of their rights except via petition for a writ of mandamus under 18 U.S.C. § 3771(d)(3)). Thus, even if we adopted the district court's interpretation of the *In re Olesen* footnote, we would nevertheless conclude it committed legal error in treating the footnote as binding.[9]

Thus, we reverse the district court's decision and remand with directions to allow supplementation based on *Brady, Napue,* and their progeny. Mr. Carter's motion to amend or supplement went beyond these claims alone, as it: (1) sought to resubmit all forty-three of his initial claims for habeas relief, many of which had already been dismissed on procedural grounds; (2) sought to add three supplemental claims, two of which actually assert a panoply of constitutional violations based on the newly discovered evidence; and (3) asked the district court to revisit a number of its prior rulings regarding exhaustion of state remedies and procedural default. We remand to the district court to determine in the first instance whether any additional supplementation or amendment on these grounds is warranted.

## C. *Timeliness of Supplemental Claims*

As noted, the general limitation period for habeas applications is one year. 28 U.S.C. § 2244(d)(1). This limitations period begins to run from the "latest of" four dates, including "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* § 2244(d)(1)(D).[10]

On April 19, 2011 and August 4, 2011, Mr. Carter obtained declarations from the Tovars stating that the Provo Police Department had provided them with favorable treatment prior to their testimony against Mr. Carter. Two weeks after the latter of these declarations, Mr. Carter moved to stay proceedings to exhaust claims based on this newly discovered evi-

---

9. To be sure, the district court did not rely wholly on the *In re Olesen* footnote, but also found that allowing Mr. Carter to amend or supplement his petition "would frustrate the purpose of AEDPA, unduly prolong this already delayed case, [and] further complicate an already complicated matter." *Carter,* 869 F.Supp.2d at 1327. In addition, it purported to make an independent finding that "disallowing amendment is necessary to protect the Victim's Representative's statutory right to a proceeding free from unreasonable delay and his right to be treated with fairness." *Id.* at 1328. But, we think these findings cannot be divorced from its reliance on the *In re Olesen* footnote.

10. Because we conclude that Mr. Carter's claim was timely under § 2244(d)(1)(D), we need not address Mr. Carter's argument that § 2244(d)(1)(B) or principles of equitable tolling apply.

dence in state court. On November 11, 2011, after this request was denied, Mr. Carter sought to amend or supplement his petition with claims based on this evidence.

■ Utah argues Mr. Carter's supplemental claims are not timely because Mr. Carter presented no evidence that he could not have located the Tovars prior to 2011 through the exercise of due diligence. Aplee. Br. 61–62. We disagree.

We begin by noting that Utah's contention appears particularly disingenuous given its assertions at resentencing and before this court that the Tovars were unavailable to testify at resentencing because they had fled the country. The state, with its extensive resources, was unable to locate the Tovars; yet it asserts that Mr. Carter, through due diligence, should have.

But more importantly, due diligence did not require Mr. Carter to divine all possible sources of suppressed evidence; he was entitled to rely on the state's representation that "all [exculpatory] evidence in any way relevant to the case and known to the State was included in police reports long ago made available" to him. *Carter II*, 888 P.2d at 636–37. "When police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." *Banks v. Dretke*, 540 U.S. 668, 675–76, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); *see also id.* at 695, 124 S.Ct. 1256 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."). As we have discussed, the prosecutorial obligation to turn over material exculpatory or impeachment evidence "continues throughout the judicial process." *Douglas*, 560 F.3d at 1173. Accordingly, courts have found under similar

circumstances that the limitation period does not begin to run until post-conviction counsel receives *Brady* evidence. *Id.* at 1181 (*Brady* claim timely under § 2244(d)(1)(D) where state shielded evidence that could have been used to impeach key witness); *Quezada v. Scribner*, 611 F.3d 1165, 1167–68 (9th Cir.2010) (*Brady* claims timely under § 2244(d)(1)(D) where state repeatedly denied existence of *Brady* material); *Mitchell v. Jones*, No. CIV 06–503–RAW–KEW, 2008 WL 496072, at *4 (E.D.Okla. Feb. 20, 2008) (holding that state court was "incorrect in placing the burden of discovery of [*Brady* evidence] on petitioner").

Thus, we hold that Mr. Carter's supplemental *Brady* and *Napue* claims are timely under § 2244(d)(1)(D).

**D.** *Stay to Pursue Unexhausted Claims in State Court*

■ Where a district court is presented with a habeas petition containing both exhausted and unexhausted claims, it may "stay the petition and hold it in abeyance while the petitioner returns to state court to exhaust his previously unexhausted claims." *Rhines*, 544 U.S. at 275, 125 S.Ct. 1528. Such a stay and abeyance is appropriate where a petitioner shows: (1) "good cause for his failure to exhaust"; (2) "his unexhausted claims are potentially meritorious"; and (3) "there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id.* at 278, 125 S.Ct. 1528. The district court denied Mr. Carter's initial motion for a stay on the grounds that no *Brady* or *Napue* claims remained in Mr. Carter's petition. When the court subsequently denied Mr. Carter's motion to amend or supplement, it further denied his renewed motion to stay. Thus, the district court did not decide the issue whether a stay to pursue unexhausted claims is appropriate,

and we remand to allow it to make this determination in the first instance.

## II. *Ineffective Assistance of Guilt–Phase Counsel*

Mr. Carter contends that his guilt-phase counsel was ineffective for: (1) failing to obtain the prosecution's file against Mr. Carter, which contained some exculpatory evidence; and (2) failing to adequately challenge the admission of Mr. Carter's confession.

To prevail on a claim of ineffective assistance of counsel, Mr. Carter must first show deficient performance—i.e., that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. Next, Mr. Carter must show prejudice—i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It does not require a showing that counsel's errors more likely than not altered the outcome of the proceedings. *Id.*

### A. *Failure to Obtain Prosecution's File*

At Mr. Carter's trial, his counsel indicated that he was "taken by surprise" by certain evidence presented by the prosecution. Trial Transcript at 1301.[11] The prosecutor stated that he had never received a proper written discovery request from defense counsel. The trial court admitted the evidence in question and found that "it doesn't appear ... that a proper specific request [for discovery of the prosecution's case file] has been made by the defense." *Id.* at 1303–04.

Within the prosecution's case file were several pieces of evidence relevant to Mr. Carter's case.[12] First, the file contained police reports regarding several other suspects, including Orla Olesen, Eva's husband.[13] Mr. Olesen failed a polygraph examination given to him in conjunction with the murder investigation. Additional evidence suggested the couple had a strained

---

11. Records from the trial and sentencing proceedings were submitted on two CDs as part of the supplemental record on appeal. We refer to the trial transcripts by Bates stamp number and resentencing transcripts by page number.

12. Rather than citing to the appendix in this case, Mr. Carter frequently cited the many records from state court proceedings, most often the record before the Utah Supreme Court in *Carter v. State*, 289 P.3d 542 (Utah 2012) (*Carter IV*). *See, e.g.*, Aplt. Br. 7–15, 19–20, 40–45. Citing to the appendix greatly assists the court. *Cf.* 10th Cir. R. 28.1(A).

13. The file also contained reports on two other suspects: Michael Cox and Gary Dean Hilfiker. Mr. Cox had a history of mental illness and was living at a local motel as part of an outpatient program at the time of the murder.

An acquaintance of Mr. Cox told the police that Mr. Cox came home at 3:30 am on the morning after the homicide and was "all shook up." 16 R. 293. Mr. Cox's shoes had footprints that bore some similarity to footprints found behind the Olesen home, but it appears the police compared the castings and did not find a match. Mr. Cox's fingerprints were not found at the scene of the crime, nor did any other physical evidence link him to the crime. Mr. Cox did not confess, nor do any of the individuals referenced in the police reports implicate Mr. Cox in the crime. As to Mr. Hilfiker, the police found that he "could not be placed at the scene through any type of evidence," including fingerprints. *Id.* at 337. Mr. Carter notes that Mr. Hilfiker was convicted seven years later for the murder of a woman who was stabbed repeatedly, but, of course, this evidence did not appear in the prosecution's file in 1985.

relationship. A neighbor of the Olesens indicated that his deceased mother had expressed concern that Mr. Olesen was a danger to Mrs. Olesen. Another neighbor stated that Orla and Eva had a troubled relationship, regularly avoided each other, and that Orla had stated he "didn't need [Eva]." 16 R. 359.

Second, the file contained a report showing that no blood or other evidence was found on clothing seized from Mr. Carter's residence. Third, the file contained evidence of a blonde pubic hair found on Mrs. Olesen's sweater that was "microscopically dissimilar" to Mrs. Olesen's.[14]

On direct appeal, the Utah Supreme Court rejected Mr. Carter's claim that trial counsel was ineffective for failing to obtain discovery of the prosecution's file, holding that he could not satisfy either prong of *Strickland*. *Carter I*, 776 P.2d at 893–94. Where a state court has adjudicated a claim on the merits, a petition for habeas relief cannot be granted unless the state adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Given that both *Strickland* and AEDPA's standards of review are "highly deferential," habeas review of ineffective assistance claims is "doubly so." *Harring-*

*ton v. Richter*, 562 U.S. 86, 105, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). Thus, we grant relief only where a state court disposition "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103, 131 S.Ct. 770.

■ We agree with the district court that counsel's failure to undertake the proper steps to receive the prosecution's case file was almost certainly deficient. *See Rompilla v. Beard*, 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case.... The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities." (quoting ABA standards)). Nevertheless, we need not address whether counsel's performance was deficient if Mr. Carter cannot show he was prejudiced by the error. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052. Upon review of the record, the Utah Supreme Court's conclusion that Mr. Carter failed to show prejudice was not unreasonable.[15]

Mr. Carter first argues the Utah Supreme Court applied the wrong legal standard when it held that his allegations did not show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Carter I*, 776 P.2d at 893–94. Mr. Carter contends the court wrongly imposed a "but-for" test,

---

**14.** It is unclear based on the record whether the prosecution's case file was before the Utah Supreme Court when it resolved Mr. Carter's ineffective assistance of guilt-phase counsel claim. *Carter I*, 776 P.2d at 893–94. For the sake of this claim, we assume, as did the district court, *Carter*, 2012 WL 3964819, at *23 n. 200, that the file was before the Utah Supreme Court. Mr. Carter appears to accept this assumption. Aplt. Br. 105 n. 9.

**15.** Because the Utah Supreme Court did not grant Mr. Carter an evidentiary hearing, he asserts its decision was an unreasonable determination of the facts entitling him to a federal evidentiary hearing. Aplt. Br. 112–14. Mr. Carter suggests such a hearing might reveal that trial counsel's decisions were not tactical. Because we conclude that, regardless, Mr. Carter cannot show prejudice, we reject this request.

omitting the key language in *Strickland* that prejudice requires only a reasonable probability that absent counsel's errors, the result would have been different. We disagree. The footnote appended to the sentence Mr. Carter cites explicitly refers to the "reasonable likelihood" standard. *Id.* at 894 n. 30.

Mr. Carter next asserts more generally that the Utah Supreme Court unreasonably concluded that he could not show prejudice. We disagree. Had counsel properly obtained discovery of the prosecution's case file, there is no reasonable probability that the jury would have reached a different outcome. *Strickland* requires us to examine "the totality of the evidence" in assessing whether counsel's errors were prejudicial. 466 U.S. at 695, 104 S.Ct. 2052; *see Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ("In assessing prejudice, we reweigh the evidence ... against the totality of available ... evidence."). Thus, where a verdict is supported by "overwhelming" evidence, an attorney's error is less likely to exert a prejudicial effect. *Strickland,* 466 U.S. at 695–96, 104 S.Ct. 2052. Here, Mr. Carter confessed to the murder of Mrs. Olesen, and his confession was corroborated by the testimony of Epifanio and Lucia Tovar.[16] Though evidence from the prosecution's file certainly would have aided in Mr. Carter's defense, we cannot say that, in light of the corroborated confession, it creates a reasonable probability the jury would have acquitted him.

Much of the evidence, such as the hearsay and double-hearsay statements regarding the relationship between Mr. and Mrs. Olesen and the results of Mr. Olesen's polygraph examination, would have faced substantial barriers to admission that Mr.

Carter does not address in his briefing. *See Wiggins,* 539 U.S. at 536, 123 S.Ct. 2527 (admissibility of evidence bears on determination of prejudice); *Neill v. Gibson,* 278 F.3d 1044, 1056 (10th Cir.2001) (holding that the district court did not abuse its discretion in refusing to consider inadmissible hearsay in its *Strickland* prejudice analysis). Further, the report that no blood was found on clothes seized from Mr. Carter's home hardly could have influenced the jury in light of the fact that counsel repeatedly emphasized the lack of physical evidence linking Mr. Carter to the crime at closing argument. Among other things, counsel argued that the state had not produced the gun involved with the murder, that no fingerprints linked Mr. Carter to the scene of the crime, and that the bullets used were not necessarily of the same type as those recovered from Mr. Carter's home. At best, the additional fact of the absence of blood on clothes seized from Mr. Carter's home would have had a negligible effect on the jury. Finally, the pubic hair found on Mrs. Olesen's sweater, which both parties suggest likely belonged to Mr. Olesen, is hardly incriminating given that Mrs. Olesen's body was found in Mr. Olesen's home and the two were married.

In short, given the doubly deferential standards of AEDPA and *Strickland,* we cannot say that the Utah Supreme Court unreasonably rejected Mr. Carter's claim of ineffective assistance of counsel for failure to obtain discovery of the prosecution's file.

### B. *Failure to Adequately Challenge Mr. Carter's Confession*

Mr. Carter was arrested in Nashville, Tennessee on June 11, 1985. The police

---

**16.** As the recent declarations from the Tovars and Provo police were not before the Utah Supreme Court when it resolved Mr. Carter's claim of ineffective assistance of guilt-phase counsel, we do not consider them in our prejudice analysis. *See Cullen v. Pinholster,* 563 U.S. 170, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011).

also arrested JoAnne Robins, a woman with three children with whom Mr. Carter had been living for three weeks. After Mr. Carter was interrogated for roughly four hours on June 11 and four hours on June 12, he confessed to Lieutenant Pierpont of the Provo police.

Prior to trial, Mr. Carter's counsel moved to suppress his confession. Counsel introduced an affidavit from Mr. Carter and called Mr. Carter to testify that the two officers who interrogated him threatened to bring charges against Ms. Robins if he did not cooperate. Counsel attempted to introduce an unsigned affidavit from Ms. Robins, but the trial court rejected this effort. Although counsel was granted leave to substitute a signed version, he did not. Finally, counsel cross-examined the two police officers regarding their testimony that they did not use threats to procure a confession from Mr. Carter.

On direct appeal, Mr. Carter argued that counsel inadequately challenged his confession, and the Utah Supreme Court rejected this argument. *Carter I*, 776 P.2d at 893. We again review this determination under the deferential standards of § 2254(d), asking simply whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 562 U.S. at 105, 131 S.Ct. 770.

■ Mr. Carter first argues that counsel erred by failing to procure a signed declaration from Ms. Robins. In support of this argument, Mr. Carter relies on a declaration from March 2009 by Ms. Robins that, at the time of Mr. Carter's arrest, police arrested her and threatened her with prosecution for "harboring an escapee/fugitive." 16 R. 361. As the Utah Supreme Court did not have this declaration before it in *Carter I*, we cannot consider it. *See Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) ("[R]eview under 28 U.S.C. § 2254(d)(1) is

limited to the record that was before the state court that adjudicated the claim on the merits."). Regardless, the fact the police might have threatened Ms. Robins directly with prosecution does not bear on whether the police threatened Mr. Carter with charging Ms. Robins in an attempt to leverage a confession. Moreover, for reasons discussed as part of Mr. Carter's Claim VII, such a threat would not render his confession involuntary.

Mr. Carter next contends that counsel should have presented the testimony of Julie Hoffman, the case preparation officer who typed Mr. Carter's confession as dictated by one of the interrogating officers. Ms. Hoffman recently signed a declaration that she did not recall transcribing Mr. Carter's statement, that it did not appear to be recorded in the normal manner, and that she is almost certain she was not present when Mr. Carter's statements were made. However, again, Mr. Carter relies solely on evidence not before the Utah Supreme Court in support of his argument; thus, we reject it. *Pinholster*, 131 S.Ct. at 1398.

Finally, Mr. Carter contends counsel failed to present evidence of his low intelligence in challenging his confession. But, for reasons discussed in our analysis of Mr. Carter's Claim VII challenging his confession, Mr. Carter cannot establish prejudice, because his low intelligence alone is insufficient to render his confession involuntary.

For the foregoing reasons, we affirm the district court's denial of habeas relief on Mr. Carter's ineffective assistance of guilt-phase counsel claims.

### III. *Ineffective Assistance of Appellate Counsel*

Mr. Carter next contends that appellate counsel was ineffective for failing to ade-

quately marshal evidence in the prosecution's file to argue ineffective assistance of trial counsel. He asserts that appellate counsel did not present the prosecution's case file to the Utah Supreme Court in attempt to establish the prejudice prong of an ineffective assistance of trial counsel claim.

The *Strickland* framework governs claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). Thus, to succeed, Mr. Carter must show that his counsel's representation was objectively unreasonable and that, absent the error, he had a reasonable likelihood of success on the appeal. *Cargle v. Mullin*, 317 F.3d 1196, 1202–03 (10th Cir.2003).

Mr. Carter raised this claim in his initial state habeas petition, and the Utah Supreme Court rejected it on the merits. *Carter III*, 44 P.3d at 641.[17] Thus, we review under the deferential standard of § 2254(d).

Mr. Carter's primary argument is that the Utah Supreme Court's determination that counsel was not ineffective was an unreasonable application of federal law.[18] For the sake of this argument, Mr. Carter takes issue with the district court's assumption that the Utah Supreme Court in *Carter I* had before it the prosecution's case file. 2012 WL 3964819, at *23 n. 200. We agree that the record is unclear on whether Mr. Carter's appellate counsel brought this evidence to the attention of the Utah Supreme Court.

However, even assuming appellate counsel did not, Mr. Carter's claim fails under *Strickland's* prejudice prong. Mr. Carter cannot show a reasonable probability that, but for counsel's failure to marshal evidence from the prosecution's file, his claim of ineffective assistance of trial counsel would have succeeded. *Cargle*, 317 F.3d at 1202. Success on the ineffective assistance of trial counsel claim would turn on a finding that trial counsel's failure to obtain the prosecution's file prejudiced Mr. Carter, which, for reasons discussed above, we have rejected. Thus, we affirm the district court's denial of this claim.

## IV. *Ineffective Assistance of Resentencing Counsel*

Mr. Carter next argues that his 1992 resentencing counsel was ineffective for:

17. Mr. Carter contends that *de novo* review applies because the Utah Supreme Court misunderstood his position to be that appellate counsel failed to argue ineffective assistance of trial counsel, when instead his position was that appellate counsel did so ineffectively. Aplt. Br. 121. However, in briefing to the Utah Supreme Court, Mr. Carter twice described his claim as "appellate counsel's failure to raise ineffectiveness of trial counsel." Appellant's Opening Brief at 11, *Carter III*, 44 P.3d 626; *id.* at 47 (24 R., Add. M). We cannot fault the Utah Supreme Court for addressing the issue as Mr. Carter framed it; thus, we reject his argument.

18. Mr. Carter makes two additional arguments why the Utah Supreme Court decision was unreasonable. First, he argues the decision was unreasonable because it relied upon since-disavowed Tenth Circuit precedent that requires a claim omitted on appeal to be a "dead-bang winner" to prevail on a claim of ineffective assistance of appellate counsel. Aplt. Br. 120 (citing *Neill*, 278 F.3d at 1057 n. 5). Mr. Carter did not raise this argument below, and in fact relied upon the "dead-bang winner" language in his argument. Regardless, under § 2254(d)(1), state court applications of federal law are measured against the yardstick of clearly established federal law "at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Second, Mr. Carter contends that because the Utah Supreme Court disposed of this claim without an evidentiary hearing, the decision resulted in unreasonable findings of fact. Mr. Carter provides no legal support for this argument; thus, we reject it.

(1) failing to adequately investigate and present mitigating evidence; (2) failing to strike a juror who Mr. Carter claims was racist and predisposed to vote in favor of the death penalty; and (3) failing to challenge the integrity of the proceedings or argue "residual doubt." We disagree.

### A. *Failure to Adequately Investigate and Present Mitigating Evidence*

At Mr. Carter's resentencing, counsel called Mr. Carter's mother, brother, and sister to testify, along with clinical and forensic psychologist Robert Howell.

Mr. Carter's mother testified that Mr. Carter's father left when he was young, and he was instead raised by his alcoholic step-father. She testified that Mr. Carter grew up in a "nice neighborhood" on Chicago's south side, but that when Mr. Carter was a teenager, they moved to a predominantly white neighborhood. There, Mr. Carter was treated poorly because of his race, including being "spat on," and chased by boys with chains. She mentioned that Mr. Carter had fallen from a bedroom window as a child and hit his head. She further testified that Mr. Carter sent her Mother's Day cards, wrote poetry, read, and learned while in prison and that she loved her son very much and did not want him to die. Resentencing Transcript 1144–63.

Mr. Carter's brother testified that they grew up in a "tough" but "close knit" neighborhood, that he and Mr. Carter had been attacked by other children because of their race, that Mr. Carter's close friend had been killed when they were young, and that he loved Mr. Carter. *Id.* at 1171–1204. Mr. Carter's sister described him as a shy child, noted that he loved children, and stated that she loved him. *Id.* at 1163–71.

Dr. Howell was a forensic and clinical psychologist with a doctoral degree in psychology that was employed by Brigham Young University at the time of Mr. Carter's resentencing. He was a member and past president of the Utah Psychological Association, a fellow of the American Psychological Association, and a past officer of the Rocky Mountain Psychological Association. Dr. Howell conducted psychological examinations of Mr. Carter over a period of eight days and spoke with several of Mr. Carter's family members and his former spouse. He testified, based on neuropsychological and physical test results and conversations with Mr. Carter, that Mr. Carter suffered from organic cerebral brain dysfunction. He testified that Mr. Carter's problems stemmed from the absence of a father figure early in his life and a head injury that Mr. Carter sustained as a teenager. He testified that, as a result of Mr. Carter's brain damage, he had impaired judgment, and substance abuse exacerbated this problem. *Id.* at 1209–35.

Finally, Mr. Carter addressed the resentencing jury in an unsworn statement in which he apologized to Mrs. Olesen's family and his family and asked the jury to spare his life.

 Mr. Carter argued ineffective assistance of resentencing counsel in his first state post-conviction proceeding. The Utah trial court rejected the claim, finding that counsel presented a "not insubstantial body of mitigating evidence," especially in light of the "vacuum" that Mr. Carter offered at the post-conviction stage. 24 R., Add. D., at 15. The Utah Supreme Court agreed, finding that Mr. Carter failed to show either prong of *Strickland.* *Carter III*, 44 P.3d at 637. Applying the deferential standards of § 2254(d), the district court concluded that the Utah Supreme Court's resolution of Mr. Carter's claim was not unreasonable. *Carter*, 2012 WL 3964819, at *32. We agree.

Mr. Carter first contends that counsel provided ineffective assistance by stipulating to the appointment of Dr. Howell as a mental health expert, both because of Dr. Howell's alleged conflict of interest and because he was not an "independent defense expert." Aplt. Br. 124–26 (citing *Ake v. Oklahoma*, 470 U.S. 68, 76, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)). Mr. Carter notes that in 1985—prior to the time Mr. Carter became a suspect and seven years before his resentencing—Dr. Howell had prepared a letter for the Provo Police Department explaining what he thought were the likely psychological traits of Mrs. Olesen's killer.

Mr. Carter provides no authority to support his contention that reasonable professional assistance required counsel to learn of Dr. Howell's earlier involvement with the investigation and request a different mental health expert. Nor does he provide support for his argument that stipulating to the appointment of a qualified mental health expert was defective assistance. Moreover, in light of the substantial mitigating testimony Dr. Howell provided, including testimony that Mr. Carter suffered from organic cerebral brain dysfunction, Mr. Carter cannot establish that he was prejudiced by counsel's decisions.

Next, Mr. Carter contends more generally that counsel's representation was ineffective because of his "halfhearted" mitigation investigation. Aplt. Br. 126–35. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691, 104 S.Ct. 2052. However, counsel must be given "wide latitude" in "making tactical decisions." *Id.* at 689, 104 S.Ct. 2052. Only where counsel's actions are not justifiable as reasonable strategic decisions can representation be defective. *See, e.g., Williams v. Taylor*, 529 U.S. 362,

395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (counsel did not conduct investigation into records due to improper belief that state law barred access to records); *Wiggins*, 539 U.S. at 526, 123 S.Ct. 2527 (counsel's failure to "investigate thoroughly resulted from inattention, not reasoned strategic judgment").

The Utah Supreme Court's conclusion that resentencing counsel was *not* deficient was not unreasonable. Counsel interviewed several of Mr. Carter's family members—his mother, his brother, and his sister—about Mr. Carter's personal and family history. This history painted Mr. Carter as a man with a difficult upbringing who was loved by his family, and who in return cared deeply about them. Further, counsel hired a mental health expert to perform an extensive examination that included physical and neuropsychological testing, resulting in a diagnosis of organic brain damage. This evidence further suggested that the organic brain damage traced back to Mr. Carter's head injury as a youth and the absence of a father figure. Counsel's efforts went well beyond the efforts of counsel in the cases on which Mr. Carter relies. *See Williams*, 529 U.S. at 369, 120 S.Ct. 1495 (counsel merely interviewed three witnesses who described defendant as a "nice boy" and "not a violent person" and presented a psychiatrist's taped statement that contained virtually no mitigation evidence); *Wiggins*, 539 U.S. at 516, 526, 123 S.Ct. 2527 (counsel conducted investigation into "a narrow set of sources" and "[a]t no point ... proffer[ed] any evidence of petitioner's life history or family background").

The crux of Mr. Carter's argument is that counsel painted a "rosy picture" of Mr. Carter's upbringing, when in fact his personal and family history were far more troubling. Aplt. Br. 129. Mr. Carter points to evidence that, among other

things: (1) Mr. Carter grew up in an area "infamous for its crime, poverty, drug addiction, and gang violence"; (2) Mr. Carter's parents and siblings frequently abused drugs and alcohol; and (3) Mr. Carter was sexually abused by his step-grandmother as a child. *Id.* at 40–42. While this may be "compelling," *Carter,* 2012 WL 3964819, at *34, it was not before the Utah Supreme Court when it resolved Mr. Carter's claim. Thus, we cannot consider it. *Pinholster,* 131 S.Ct. at 1398.[19]

**B.** *Failure to Remove Juror David Nelson*

In a juror questionnaire, potential juror David Nelson indicated that he believed in "blood atonement," which he described to mean "[i]f you take a life you must pay for it with your life." He also indicated that he believed in the "mark of Cain," which he described to mean "[b]lack skin or dark skin for Cain killing Able [sic]." He explained that he believed the death penalty was warranted "when it is is [sic] premeditated murder." While voting for the death penalty would "scare[ ]" and "haunt" him, he "would vote for it if [it] was needed."

At voir dire, Mr. Nelson stated that there was nothing in his belief system that would cause him to automatically vote for the death penalty, and the fact that Mr. Carter was black would not affect his view of the case at hand. He explained he would make a decision based on the facts presented and would follow the court's instructions. Mr. Nelson subsequently became the foreman of Mr. Carter's jury.

Mr. Carter contends that resentencing counsel was ineffective for not removing Mr. Nelson, because he "openly admitted holding racist views" and "felt the only appropriate sentence for murder was death." Aplt. Br. 135. The Utah Supreme Court rejected this argument in Mr. Carter's first state post-conviction appeal, finding that Mr. Carter could not satisfy either prong of *Strickland.* *Carter III,* 44 P.3d at 637–39. Because the Utah Supreme Court resolved Mr. Carter's claim on the merits, we review under the deferential standards of § 2254(d).

Pursuant to *Strickland,* we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689, 104 S.Ct. 2052. Moreover, this court has held that "an attorney's actions during voir dire are considered to be matters of trial strategy" and, as such, "cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill chosen that it permeates the entire trial with obvious unfairness." *Nguyen v. Reynolds,* 131 F.3d 1340, 1349 (10th Cir. 1997); *see also United States v. Taylor,* 832 F.2d 1187, 1196 (10th Cir.1987) ("[T]he use of peremptory challenges to construct a fair and impartial jury panel will normally fall squarely within the realm of a tactical trial decision.").

Mr. Carter relies primarily on *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), for his argument that counsel's failure to strike Mr.

---

**19.** Mr. Carter contends that *Martinez v. Ryan,* — U.S. ——, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), "provides a vehicle for the federal court to consider the compelling evidence of mitigation," *Pinholster* notwithstanding. Aplt. Br. 124, 142–49. *Martinez* held that, where claims of ineffective assistance of trial counsel must be raised in collateral proceedings, ineffective assistance of initial post-con-

viction counsel can establish cause for procedural default of the ineffective assistance of trial counsel claim. 132 S.Ct. at 1320. But the ineffective assistance of sentencing counsel claims at issue here were not found to be procedurally defaulted; they were rejected on the merits by the Utah Supreme Court, in *Carter III.* Thus, *Martinez* provides Mr. Carter no relief.

Nelson amounted to ineffective assistance. *Morgan* held that jurors who would automatically vote for the death penalty must be removed for cause under the Due Process Clause. *Id.* at 729, 112 S.Ct. 2222. But Mr. Nelson explicitly stated that nothing in his belief system would lead him to conclude automatically that Mr. Carter should receive the death penalty.

Mr. Carter further asserts that counsel struck other potential jurors who held the same beliefs as Mr. Nelson, indicating that his failure to strike Mr. Nelson was the product of neglect, not strategy. But a review of the beliefs of these other potential jurors indicates that counsel had good reason to remove them while still passing Mr. Nelson. One believed racial minorities were prone to commit more crime, believed defense attorneys coached their clients to lie, had negative feelings toward Mr. Carter, and was uncertain he was capable of following the court's instructions. Another believed the death penalty was warranted in most murder cases and was opposed to serving as a juror. And, a third stated he was biased against people of Mr. Carter's race and incapable of making a decision independent of race, and that he believed Mr. Carter "should die for what he did."

To be sure, the fact that jurors with such extreme views were stricken does not preclude a finding that failure to strike a juror with less extreme views constitutes deficient performance. However, it does belie Mr. Carter's assertion that counsel's failure to strike Mr. Nelson was merely the product of neglect. Counsel questioned Mr. Nelson at length regarding his juror questionnaire answers. Mr. Nelson explained that he would not automatically vote for the death penalty, that his belief in the "mark of Cain" was not relevant to the case at hand, that he would make his

decision based on the facts presented in court, and that he would follow the court's instructions. Most significantly, counsel knew that voting for the death penalty would "scare" and "haunt" Mr. Nelson, and that he would only vote for it if "needed."

In light of *Strickland's* presumption of reasonable representation, and the greater force this presumption assumes in the context of voir dire, we cannot say that the Utah Supreme Court's decision was unreasonable.

### C. *Failure to Challenge Integrity of the Proceedings*

Finally, Mr. Carter contends resentencing counsel was ineffective for "fail[ing] to introduce into the record the substantial and compelling evidence of residual doubt that existed." Aplt. Br. 140. However, the jury was specifically informed by the court that it was "improper for you to again debate or reconsider the question of the defendant's guilt or innocence." Moreover, Mr. Carter cites no authority suggesting that failure to argue residual doubt can constitute ineffective assistance. Thus, we reject his argument.

### V. *Prosecutorial Vouching and Comment on Mr. Carter's Silence*

Mr. Carter next contends that his right to due process and right to remain silent were violated by: (1) the prosecutor's vouching for the credibility of Lucia Tovar at closing argument; and (2) the prosecutor's statement at closing argument that he had heard no evidence suggesting Mr. Carter's confession was coerced. Mr. Carter raised these claims on direct appeal, and the Utah Supreme Court rejected them on the merits. *Carter I*, 776 P.2d at

891, 896.[20] Thus, we again review under the deferential standards of § 2254(d).

### A. Vouching for Lucia Tovar's Testimony

At closing argument, the prosecutor stated: "You know, Lucia Tovar to me was one of the most impressive witnesses in this particular case. She told you in all honesty everything that she saw." Trial Transcript at 1353. Mr. Carter contends that this statement amounted to prosecutorial vouching in violation of his right to due process.

A prosecutor has a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Thus, an attorney cannot "indicat[e] a personal belief in [a] witness' credibility . . . through explicit personal assurances of the witness' veracity." *United States v. Bowie,* 892 F.2d 1494, 1498 (10th Cir.1990); *Berger,* 295 U.S. at 88, 55 S.Ct. 629 (prosecutor must refrain from "improper suggestions, insinuations, and, especially, assertions of personal knowledge").

In order to prevail on a claim of prosecutorial vouching, a petitioner must show prejudice. *See United States v. Young,* 470 U.S. 1, 18, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *Berger,* 295 U.S. at 89, 55 S.Ct. 629. Courts must consider whether the misconduct of the prosecutor was "slight or confined to a single instance," as opposed to "pronounced and persistent." *Berger,* 295 U.S. at 89, 55 S.Ct. 629. The appropriate inquiry is whether a prosecutor's remark "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *see also Patton v. Mullin,* 425 F.3d 788, 811 (10th Cir.2005). This analysis must consider "all the surrounding circumstances, including the strength of the state's case." *Hamilton v. Mullin,* 436 F.3d 1181, 1187 (10th Cir.2006) (quoting *Coleman v. Brown,* 802 F.2d 1227, 1237 (10th Cir.1986)).

Here, we cannot say that the Utah Supreme Court's resolution of Mr. Carter's claim was unreasonable. The prosecutor's single offhanded remark did not so infect Mr. Carter's trial with unfairness that it amounted to a denial of due process. The comment was an isolated instance and certainly not a recurring theme of the prosecution's closing argument. Furthermore, the court instructed the jury that counsel's statements were not to be considered as evidence. Trial Transcript at 162, 170; *see United States v. Roberts,* 185 F.3d 1125, 1144 (10th Cir.1999) (relying in part on a jury instruction that "the statements and arguments of these lawyers are not evidence" in concluding that prosecutor's comments were harmless error). Thus, we conclude that Mr. Carter has not shown that the Utah Supreme Court's resolution of his claim was unreasonable.[21]

---

**20.** As to Mr. Carter's claim of prosecutorial vouching, the Utah Supreme Court did not address the claim individually, but simply stated that it had "reviewed [Mr. Carter's] other claims raised on appeal and f[ound] them to be without merit." *Carter I,* 776 P.2d at 896. Mr. Carter does not dispute that this was a merits disposition.

**21.** At the conclusion of Mr. Carter's argument, he asserts "[t]he new information regarding the Tovars should also be considered in determining this claim." Aplt. Br. 153. He provides no legal support for this contention and no explanation why consideration of such evidence would not be barred by *Pinholster,* 131 S.Ct. at 1398. However, we note that our rejection of Mr. Carter's claim of improper vouching for Mrs. Tovar should not

## B. *Prosecutor's Comment on Mr. Carter's Silence*

At Mr. Carter's trial, Sgt. Cunningham and Lt. Pierpont, who interrogated Mr. Carter in advance of his confession, testified that they did not leverage Mr. Carter's concern for JoAnne Robins, the woman with whom Mr. Carter was living, to extract a confession. Before closing argument, the court instructed the jury that Mr. Carter was not required to testify and that the jury could not consider his decision not to testify as evidence of guilt. At closing argument, the prosecutor said,

> I heard no evidence, evidence, [sic] from the witness stand about coercion or about inducing somebody to say anything about something that didn't happen. I heard no evidence that supports any other theory in this case than the theory that was presented by the State of Utah, that he's guilty of first degree murder.

Trial Transcript at 1386. Mr. Carter contends this amounted to an unconstitutional comment on his right to remain silent.

■■ The Fifth Amendment prohibits "comment by the prosecution on the accused's silence ... that such silence is evidence of guilt." *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). This includes suggestions that a defendant's silence is indicative of guilt. *Portuondo v. Agard,* 529 U.S. 61, 69, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000). Mr. Carter relies on *Battenfield v. Gibson,* 236 F.3d 1215 (10th Cir.2001), for the argument that, where a prosecutor notes the absence of testimony on a matter that could be explained "only by the accused," the prosecutor unconstitutionally comments on a defendant's choice not to testify. Aplt. Br. 155.

■■ As an initial matter, Mr. Carter cannot be granted relief under § 2254(d) unless the state court decision is contrary to, or an unreasonable application of, Supreme Court—not appellate court—decisions. *Lopez v. Smith,* —— U.S. ——, 135 S.Ct. 1, 2, 190 L.Ed.2d 1 (2014). But even if *Battenfield* was clearly established Supreme Court law, it would not warrant relief. The prosecutor's comments do not touch on a matter that could be explained only by Mr. Carter. Testimony suggesting coercion could have come from other sources, including Lt. Pierpont and Sgt. Cunningham. The fact that the officers "were not inclined to testify to the nature of the coercion," Aplt. Br. 154, does not mean that they could not have done so. Thus, we affirm the district court's denial of relief.

## VI. *Confrontation Clause Challenge*

■■ Mr. Carter next contends that his Confrontation Clause rights were violated when the prosecution introduced transcripts of the Tovars' trial testimony into evidence at resentencing.[22] Under *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980),[23] "when a hearsay declarant is not present for cross-examination at trial," the Confrontation Clause

be construed as a rejection of his related supplemental claim of prosecutorial misconduct based on knowing use of false evidence under *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

**22.** Though Mr. Carter also characterizes this argument as a due process challenge, he cites no authority suggesting the Due Process Clause is implicated.

**23.** Mr. Carter's sentence became final in 1995, prior to *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); thus, the *Roberts* framework applies to his Confrontation Clause challenge. *Whorton v. Bockting,* 549 U.S. 406, 417–18, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007).

requires a showing that: (1) the declarant is "unavailable"; and (2) the statement bears adequate "indicia of reliability." *Id.* at 66, 100 S.Ct. 2531. Mr. Carter contends both that the Tovars were not "unavailable" and that their testimony did not bear "sufficient indicia of reliability."

As discussed above, the Tovars were key witnesses in the guilt phase of Mr. Carter's trial. Prior to Mr. Carter's resentencing in 1992, Lt. Pierpont of the Provo Police Department was unable to locate the Tovars. He testified at resentencing that he called the United States Marshals Service, because he knew they had a warrant out for the Tovars' arrest, but the Marshals did not know of the Tovars' whereabouts. Resentencing Transcript at 49. He testified that he had checked with the Salt Lake City jail "several years back," but they had no information either. He stated he had done "[n]othing" else to locate the Tovars. *Id.* at 50, 52.

The state court held that Utah had made a "reasonable effort" to locate the Tovars and admitted transcripts of their guilt-phase testimony into evidence. At sentencing, the prosecutor referenced the Tovars' testimony to argue Mr. Carter lacked remorse.

Mr. Carter argued on appeal that the admission of the transcripts violated his Confrontation Clause rights, and the Utah Supreme Court rejected his argument. *Carter II,* 888 P.2d at 645–47. Thus, we again review under the deferential standards of § 2254(d).

 The Supreme Court has never held that the Confrontation Clause applies at capital sentencing. *See Wilson v. Sirmons,* 536 F.3d 1064, 1111–12 (10th Cir. 2008) ("[W]e have recently stated that it is 'far from clear' whether the Confrontation Clause even applies at capital sentencing proceedings." (quoting *United States v. Barrett,* 496 F.3d 1079, 1099 (10th Cir.

2007))); *United States v. Brown,* 441 F.3d 1330, 1361 n. 12 (11th Cir.2006) (same); *United States v. Higgs,* 353 F.3d 281, 324 (4th Cir.2003) (same); *Szabo v. Walls,* 313 F.3d 392, 398 (7th Cir.2002) ("[T]he Supreme Court has held that the Confrontation Clause does not apply to capital sentencing. It applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty."). Because the Utah Supreme Court's decision was not contrary to, or an unreasonable application of, Supreme Court precedent, we affirm the district court's denial of relief.

## VII. *Mr. Carter's Confession*

Mr. Carter next argues that the admission of his confession violated his right not to be compelled to be a witness against himself.

Mr. Carter was arrested in Nashville, Tennessee on June 11, 1985. The police also arrested JoAnne Robins, a woman with three children with whom Mr. Carter had been living for three weeks. Mr. Carter saw Ms. Robins while they were in custody and asked about her several times during the course of his interrogation.

Sgt. Cunningham of the Nashville police interrogated Mr. Carter from roughly 10:00 am until 3:00 pm June 11 and 10:00 am until 2:30 pm on June 12. Sgt. Cunningham stated that he gave Mr. Carter his *Miranda* warnings before both interrogations and regularly gave him 10–15 minute breaks, during which Mr. Carter was allowed to smoke, drink water, and use the restroom. On June 12, around 3:00 pm, Lt. Pierpont of the Provo Police Department, who had traveled to Nashville, began to interrogate Mr. Carter. After roughly thirty minutes, Mr. Carter confessed to the murder of Mrs. Olesen.

Lt. Pierpont dictated Mr. Carter's statement to a typist line by line.[24] Mr. Carter had an opportunity to read the statement and make corrections before signing, but he made none. He acknowledged that the typed statement presented to the court contained his signature, but he claimed that the statement he actually signed began differently.

At trial, Mr. Carter moved to suppress his confession on the grounds that it was coerced. Mr. Carter testified that the detectives threatened that, if he did not confess, Ms. Robins would go to prison and lose her children. Both detectives denied using such tactics. Neither detective knew of Mr. Carter's educational background or low intelligence.

The trial court admitted the confession, and the Utah Supreme Court affirmed. *Carter I*, 776 P.2d at 889–91. Thus, we review under the deferential standards of § 2254(d).

 For a confession to be admissible, the state must prove by a preponderance of the evidence that the confession was given voluntarily based on "the totality of all the surrounding circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Relevant factors include the youth, intelligence, and education of the accused, whether he was read his rights, the "repeated and prolonged nature of the questioning," and the use of physical punishment. *Id.* Ultimately, the proper inquiry is whether the confession was "the product of an essentially free and unconstrained choice," or whether the individual's "will has been overborne." *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6

L.Ed.2d 1037 (1961). Mr. Carter highlights several aspects of his interrogation: the "length of confinement," the "rigor of questioning," "Carter's lack of education and low intellectual functioning," and his "concern for Ms. Robins and her children." He argues that, cumulatively, these factors show that his will was overborne. We disagree.

Neither of the first two factors support Mr. Carter's argument. Mr. Carter's detention and interrogation were not unusually long. He was questioned for two periods of roughly four to five hours across two days and given ample breaks during which he could smoke, use the restroom, and eat. No evidence suggests that the questioning was unusually rigorous, deceitful, or overbearing.

As to the third factor, Mr. Carter contends "[i]t has been established that Carter has borderline intellectual functioning." Aplt. Br. 170. For this proposition, Mr. Carter once again cites evidence that was not before the Utah Supreme Court; thus, we cannot consider it. *Ryan v. Gonzales*, — U.S. ——, 133 S.Ct. 696, 708, 184 L.Ed.2d 528 (2013). Even assuming that evidence of Mr. Carter's low intellectual ability was before the Utah Supreme Court, no evidence suggests that either of the detectives were aware of this fact. Mr. Carter's bare assertion that "Carter's lack of education and the intellectual deficiency certainly would have been apparent," Aplt. Br. 170, cannot suffice. For "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S.

---

**24.** Typist Julie Hoffman's name—but not her signature—appears on the confession. As discussed above, in 2009 Ms. Hoffman executed a declaration discussing irregularities in the way Mr. Carter's confession was recorded.

This evidence was not before the Utah Supreme Court when it resolved Mr. Carter's claim; thus, we do not consider it. *Pinholster*, 131 S.Ct. at 1398.

157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

Finally, Mr. Carter suggests that because he was made aware that Ms. Robins was arrested, his confession was coerced. Mr. Carter relies primarily on *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), for this argument. In *Lynumn*, the Court held the defendant's confession to be involuntary where police informed her that, if she did not cooperate, she could be sent to jail for ten years and her two children would be given to strangers. *Id.* at 531–34, 83 S.Ct. 917. But Mr. Carter's mere knowledge of the detention of a woman with whom he had been living for three weeks has nowhere near the coercive power of an explicit threat to take away a mother's children.

Beyond *Lynumn*, Mr. Carter relies on circuit authorities, pursuant to which we cannot grant relief under § 2254(d). *Glebe v. Frost*, —— U.S. ——, 135 S.Ct. 429, 431, 190 L.Ed.2d 317 (2014) (per curiam). Regardless, the degree of police coercion in these cases was far greater than anything present here. *See, e.g., Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir.1977) (prosecutors and police "went to extraordinary lengths to extract from petitioner a confession" by exploiting relationship between petitioner and his girlfriend).

For the foregoing reasons, we cannot say that the Utah Supreme Court's conclusion that Mr. Carter's confession was voluntarily given was unreasonable.

## VIII. *Cumulative Error*

Mr. Carter's final argument is that his conviction and sentence should be reversed for cumulative error. Cumulative-error analysis "aggregates all errors found to be harmless and 'analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" *United States v. Toles*, 297 F.3d 959, 972 (10th Cir.2002) (quoting *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir.1990) (en banc)).

In analyzing Mr. Carter's claim, the district court acknowledged that, given Mr. Carter's pending state court claims, "the outcome of a cumulative error analysis may be different in the future." *Carter*, 2012 WL 3964819, at *50. Nevertheless, it rejected Mr. Carter's cumulative error claim on the ground that Mr. Carter established only one error (defective performance of counsel), and Mr. Carter had not shown that this error had prejudiced him. We agree with the district court that any cumulative error analysis could be altered by Mr. Carter's remaining claims. As such, we think the appropriate course of action is to wait until those claims are resolved before reviewing Mr. Carter's claim of cumulative error. Thus, we vacate the district court's denial of habeas relief on this ground.

In summary, the district court's denial of Mr. Carter's motion to supplement his initial habeas petition with claims of prosecutorial misconduct and suppression of evidence based on newly discovered evidence is reversed and remanded for further proceedings, including a determination whether to grant Mr. Carter a stay to exhaust these claims in state court. The district court's denial of Mr. Carter's claim of cumulative error is vacated. In all other respects, the judgment denying habeas relief is affirmed.

AFFIRMED in part, REVERSED in part, and REMANDED.